**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7           IN THE UNITED STATES DISTRICT COURT

8         FOR THE NORTHERN DISTRICT OF CALIFORNIA

9              SAN FRANCISCO DIVISION

10

11   ONEBEACON INSURANCE COMPANY,          No. C 14-01200 RS
     *et al.*,

12                Appellants,              **ORDER DENYING APPEAL FROM
                                           CONFIRMATION OF REVSIED PLAN
13        v.                               OF REORGANIZATION**

14   PLANT INSULATION CO., *et al.*,

15                Appellees.
                                    _____/
16

17

18               I.    INTRODUCTION

19        This appeal marks the latest chapter in the reorganization of Plant Insulation Company, a

20   Chapter 11 debtor formerly involved in the sale, installation, repair, and distribution of products

21   containing asbestos.  The Ninth Circuit rejected Plant's prior reorganization plan (the "Original

22   Plan"), holding the plan failed to comply with 11 U.S.C. § 524(g)(2)(B)(i)(III), a Bankruptcy Code

23   provision that seeks to ensure a reorganized debtor's future operations are controlled by an asbestos

24   trust formed under § 524(g).  The Plan Proponents then formulated and lodged an amended plan (the

25   "Revised Plan"), which was subsequently confirmed by the bankruptcy court.[1]  A contingent of

26

27

28   _____
     [1] The Plan Proponents consist of Plant, the Official Committee of Unsecured Creditors, and the
     Futures Representative.

**United States District Court**
For the Northern District of California

1   Plant's insurers lodged this appeal of the confirmation order, arguing the Revised Plan still violates

2   § 524(g)(2)(B)(i)(III).  For the following reasons, the appeal is denied.

3                                    II.        BACKGROUND

4          The factual background of Plant's bankruptcy and Bayside's formation is set out in the prior

5   order confirming the Original Plan.  *See In re Plant Insulation Co.*, 485 B.R. 203 (N.D. Cal. 2012)

6   ("*Plant II*") *aff'd*, 544 F. App'x 669 (9th Cir. 2013) *and rev'd*, 734 F.3d 900 (9th Cir. 2013) *cert.*

7   *denied*, 134 S. Ct. 1901 (U.S. 2014).  That history need not be repeated here.

8          A.  Plan Mechanics

9          Before addressing the new features of the Revised Plan, which is substantially similar to the

10  Original Plan, a general summary of the Plans' structure is warranted.[2]  The Plan provides two

11  avenues for compensating existing and future asbestos injury claimants: (1) from a trust established

12  under § 524(g) ("the Trust"), and (2) by preserving claimants' right to file tort actions against Plant

13  and insurers that refuse to settle such claims (the "Non-Settling Insurers") by making cash

14  contributions to the Trust.  The § 524(g) injunction operates to create strong incentives for Plant's

15  remaining insurers to settle their potential liabilities by making cash contributions to the Trust, or

16  else continue to defend asbestos injury claims without any possibility of receiving reimbursement

17  from Plant if its underlying liability policies are ultimately determined to be exhausted.  In exchange

18  for such settlement payments, the injunction completely releases so-called Settling Insurers from all

19  claims brought by all parties, including tort claims asserted by asbestos injury claimants, and claims

20  for equitable contribution that might otherwise be brought by Non-Settling Insurers.

21         The Plan further provides partial payment for general unsecured creditors, including

22  insurers' claims for reimbursement, by setting aside ten percent of all available funds (e.g.,

23  insurance settlement proceeds) to the Unsecured Claims Reserve.   All other available cash proceeds

24  are transferred to the Trust for reimbursement to asbestos injury claimants.  Distributions to those

25  claimants will be made according to established "Trust Distribution Procedures," which enable the

26  Trust's administrators to determine the amount of compensable damages for each claimant as well

27

28

---

[2] Absent specific mention of the Original Plan or the Revised Plan, any general reference in this order to "the Plan" is intended to describe both versions.

2

**United States District Court**
For the Northern District of California

1   as the proportion of the Trust's funds that may be paid out to each claimant without depleting

2   payments to future claimants.

3         Alternatively, under the Plan, asbestos injury claimants retain their right to pursue Plant and

4   Non-Settling Insurers by filing a tort action, subject to several conditions.  First, a determination by

5   the Trust as to the validity or sum of compensable claims cannot provide a basis for liability in the

6   courts.  Second, if a claimant obtains a judgment against Plant, he or she may file suit (or Direct

7   Action) against the Non-Settling Insurers to determine whether the claim is covered by insurance.

8   Claimants are enjoined from enforcing any such judgment against the Settling Insurers,

9   (reorganized) Bayside, or the officers, directors, or shareholders of either Plant or Bayside.  In

10  addition, any such judgment against a Non-Settling Insurer obtained by an asbestos injury claimant

11  must be reduced by the amount previously recovered by the claimant from the Trust.  By the same

12  token, a claimant who is fully compensated in such a Direct Action against a Non-Settling Insurer

13  may not seek to recover from the Fund.  Finally, a claimant may not proceed with a Direct Action

14  unless he or she agrees in writing that the Non-Settling Insurer may offset from any recovery

15  otherwise available in a final judgment, the amount of equitable contributions (including for defense

16  costs) that would be available to the Non-Settling Insurer from other Settling Insurers, collection of

17  which is enjoined under the Plan.  The foregoing deductions to Direct Action judgments are only

18  applicable if the Action goes to trial and leads to a final judgment.  In other words, those deductions

19  are not available to the Non-Settling Insurers in asbestos-related cases that are dismissed without

20  any payment to the claimant or settled before judgment.

21        The Plan also requires the merger of Plant and Bayside, under the latter's name.  As part of

22  that transaction, the Trust will invest $2 million in the reorganized Bayside and receive 40 percent

23  of the common stock of the company in exchange, as well as a warrant to purchase an additional 11

24  percent of shares (thus totaling 51 percent of voting shares).  Reorganized Bayside is to assume

25  Plant's responsibilities to its insurers under the latter's liability policies, post-merger.

26        B.  The Ninth Circuit Opinion

27        A contingent of Non-Settling Insurers appealed this court's order affirming the Original

28  Plan, challenging various of its aspects as violating the U.S. Constitution, the Bankruptcy Code,

California law, and rules of equity.  While rejecting most of the Insurers' arguments, the Ninth

**United States District Court**
For the Northern District of California

1  Circuit concluded that the Original Plan had one fatal flaw: it failed to comply with §

2  524(g)(2)(B)(i)(III), which specifies that the trust must "own, or by the exercise of rights granted

3  under such plan would be entitled to own if specified contingencies occur, a majority of the voting

4  shares" of the reorganized debtor.  The parties refer to this provision as the "control requirement."

5  The Original Plan provided that the Trust could gain 51% ownership of Bayside in two

6  different ways.  First, the Trust could invoke its outstanding warrant to purchase an additional 11%

7  of the shares of Bayside, bringing its ownership to 51%.  Importantly, the warrant was tied to the

8  pro rata share price of the Trust's initial $2 million investment in 40% of the company.

9  Accordingly, to exercise its warrant under the Original Plan, the Trust would have been required to

10  pay an additional $1,122,559.  Second, the Original Plan required Bayside to provide the Trust with

11  a $250,000 promissory note secured by additional shares in the company.  If Bayside defaulted on

12  the note, the Trust would receive enough additional shares to bring the Trust into majority

13  ownership of the company.

14  The parties disputed whether either contingency satisfied the requirement that the Trust be

15  entitled to own, "if specified contingencies occur," a majority of the voting shares of Bayside.  *See*

16  11 § 524(g)(2)(B)(i)(III).  Because the statute does not explicitly limit the sort or nature of the

17  contingencies that would satisfy the control requirement, the prior confirmation order concluded that

18  *any* contingency suffices, so long as some circumstances are provided in the plan that would,

19  through the exercise of rights granted therein, allow the trust to gain majority control of the

20  reorganized debtor.  *See Plant II*, 485 B.R. at 226-27.  The Ninth Circuit disagreed, finding that such

21  an interpretation would allow for scenarios where the trust would retain merely an illusory form of

22  prospective "control" of the reorganized debtor:

23      If "specified contingencies" could include any contingency—such as a meteor hitting
        the Empire State Building—then the subsection has no content because the plan
24      drafters could write it out of existence at will.

25  *In re Plant Insulation Co.*, 734 F.3d 900, 915 (9th Cir. 2013) ("*Plant III*") cert. denied, 134 S. Ct.

26  1901 (U.S. 2014).

27  The Ninth Circuit's interpretation of the control requirement grew out of several

28  observations about § 524(g)'s text, design, and history.  First, the court emphasized that the

language of § 524(g)(2)(B)(i)(III) uses the "key phrase 'voting shares.'"  *Id.*  "This is significant,"

4

1   the court noted, "because it signals that this section is about control over the reorganized debtor's

2   future operations." *Id.*  The court also found support in the design of § 524(g) as a whole:

3       [T]he design of § 524(g) reveals that this subsection is a key piece governing the
        relationship of the trust to the reorganized debtor.  It is one of only four requirements
4       that § 524(g) places on the trust.  The other three require the trust: (1) to assume the
        liabilities of the debtor for asbestos actions; (2) to be at least partially funded by
5       equity in the debtor; and (3) to use trust assets or income to pay asbestos claimants.
        Read together, these requirements are part of a scheme that ensures that, after the
6       bankruptcy, the trust stands in for the debtor with regard to asbestos claims and the
7       debtor continues to operate its business for the benefit of the trust.

8   *Id.* at 916.  This design is "thwarted," the court concluded, "if a plan can make control of the debtor

9   effectively impossible." *Id.*

10      The court's reading of § 524(g) was also informed by the statute's history.  Enacted in 1994,

11  § 524(g) was modeled after the approach taken in the "celebrated" Johns-Manville bankruptcy case.

12  734 F.3d at 915 (citing *Kane v. Johns–Manville Corp.*, 843 F.2d 636 (2d Cir. 1988)).  The Johns-

13  Manville "approach" refers to the realization that, "given the lengthy latency period of asbestos-

14  related diseases, companies facing asbestos risk have no way finally to resolve or even effectively

15  estimate their exposure."  734 F.3d 905-06.  If such companies collapse and liquidate, "untold

16  numbers of future claimants will be left without recovery." *Id.*  Meanwhile, present claimants want

17  to be paid quickly and efficiently.  "The Johns–Manville approach, now codified in § 524(g), seeks

18  to use the broad equitable power of the bankruptcy court to resolve the dilemma in a way that is fair

19  for both present and future asbestos claimants." *Id.*  This history, the court found, "suggests that [§

20  524(g)(2)(B)(i)(III)] is not to be lightly discarded." *Id.* at 916.

21      In light of the statute's text, history, and design, the Ninth Circuit set out the following

22  standard for determining when a plan, by virtue of its "specified contingencies," satisfies §

23  524(g)(2)(B)(i)(III):

24      "[S]pecified contingencies" . . . refers to contingencies regulated by the bankruptcy
        court to ensure that control is either a realistic possibility or a backstop to trust
25      insufficiency. The plan can still "specify" what contingencies suffice, but those
        contingencies cannot be "shams" that allow control facially, but not in practice. To
26      the extent Congress has provided an exception to the general rule that the trust should
27      control the reorganized debtor, the overarching goal—that asbestos claimants get
        paid to the full possible extent—informs that exception.
28

5

**United States District Court**
For the Northern District of California

1    *Id.* at 916.  Applying this framework to the Original Plan, the court concluded that neither of the

2    proposed contingencies satisfied the statute.  Notably, as to the 11% warrant, the court held that "[a]

3    mere right of the plan to purchase shares ordinarily will not suffice."[3]  *Id.*  The court observed that if

4    a trust is struggling to pay claims in the first place, it cannot be expected to purchase control of the

5    reorganized debtor.  "[S]uch a right leaves the trust in scarcely a better position than a third party . . .

6    . This is especially true where, as here, the price the Trust would have to pay is fixed at roughly four

7    times the current value of the equity."  *Id.*  The court offered some contrasting examples, remarking

8    that it was "easy to imagine" what contingencies might satisfy the statute:

9           Most straightforwardly, a contingency that promised to transfer control to the trust in
            the event that it proved insufficient would clearly comply with this provision. A
10          buyout right could be satisfactory, if that right placed the trust at an advantage such
            that it could use that right to claim value. Either of these would be consistent with the
11          purpose of this section: to ensure the reorganized debtor continues to operate for the
            benefit of asbestos claimants.
12

13   *Id.* at 916 n. 9.

14          In sum, the Ninth Circuit in *Plant III* made clear that while a trust is not *required* to own a

15   controlling portion of the reorganized debtor, the plan must at least enable the trust to obtain and

16   exercise control in a way that "would meaningfully benefit the Trust."  *Id.* at 917.  If a contingency

17   is illusory or burdensome, it will not ensure that the debtor continues to operate for the benefit of

18   asbestos claimants.

19          C.   The Revised Plan

20          Shortly following remand, the Plan Proponents proffered an amended plan that, in their

21   view, passes muster under the Ninth Circuit's reading of the statute.  The Revised Plan makes five

22   changes regarding the Trust's ownership of Bayside.  First, the warrant exercise price is

23   significantly lower and provides actual "benefit" to the Trust.  Under the Revised Plan, the Trust

24   receives a warrant entitling it to purchase 11% of Bayside (bringing the Trust's ownership to 51%)

25   for merely $1.  The Original Plan, by contrast, required the Trust shell out $1,122,559 to exercise

26   the warrant.

27

28
     _____
     [3] The court also found that the note-default condition failed to comply with the statute, but because
     that condition is not at issue in the Revised Plan, it need not be discussed further.

1         Second, the Revised Plan expressly authorizes the Trust to sell its shares to any party,

2   subject to the Right of First Offer described below.  The Original Plan did not expressly authorize

3   the Trust to sell its shares to anyone other than Bayside or shareholders Shahram Ameli and Ali

4   Badakhshan, who also serve as Bayside's managers.

5         Third, the Revised Plan includes a Right of First Offer ("ROFO") that requires the Trust

6   follow certain procedures prior to selling its Bayside shares.  If the Trust wishes to sell any of the

7   shares, it must first offer them to Bayside, Ameli, and Badakhshan (the "ROFO holders").  If any

8   one ROFO holder agrees to purchase the shares, and if the buyer and seller cannot subsequently

9   agree on a price, the shares are to be sold at a price determined by "baseball" arbitration.[4]  If any

10  ROFO holder elects to purchase the shares, the Trust is further obligated to finance the full amount

11  of the purchase price through a fully amortized five-year loan at an interest rate of 3.75%.  The loan

12  must be secured by the shares purchased, and if the shares are bought by Bayside, such shares must

13  be guaranteed by Ameli and Badakhshan.

14        Fourth, the Revised Plan provides the Trust with certain "put" rights, under which the Trust

15  can require Bayside to repurchase those shares held by the Trust.  If this right is exercised, and if the

16  parties cannot agree on a sale price, the shares are valued via baseball arbitration as described above.

17  Fifth, the Revised Plan does away with certain "call rights" from the Original Plan that benefitted

18  Bayside and its managers.  Specifically, under the Original Plan, Bayside, Ameli, and Badakhshan

19  had the right to repurchase, at a predetermined price, any Bayside shares held by the Trust.  Under

20  the Revised Plan, by contrast, the Trust cannot be forced to sell its shares to Bayside, Ameli,

21  Badakhshan, or anyone else.

22        The Proponents moved to confirm the Revised Plan.  The Non-Settling Insurers objected,

23  asserting two primary arguments: (1) that the plan still did not satisfy the control requirement of §

24  524(g)(2)(B)(i)(III) and (2) that the plan did not satisfy the "feasibility" requirement of §

25  1129(a)(11).[5]  After the parties conducted additional limited discovery, the bankruptcy court held a

26

27  [4] In "baseball" arbitration, the buyer and seller each hire their own appraiser, who prepares a
    separate valuation report.  The arbitrator then selects the report that she determines to be the more
    reasonable estimate of value, and adopts that value as the purchase price for the shares.  *See*

28  Bankruptcy Court Memorandum Re: Confirmation of Revised Plan Following Remand, No. 09-
    31347, ECF No. 2721 (Bankr. N.D. Cal. February 24, 2014) ("*Plant IV*").

    [5] The Insurers do not contest on appeal whether the Revised Plan is feasible under § 1129(a)(11).

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1   two-day evidentiary hearing on the Proponents' motion to confirm the Revised Plan.  On February

2   24, 2014, the court issued findings of fact and conclusions of law overruling the objections.  *See*

3   *Plant IV*.  The Revised Plan was confirmed shortly thereafter.  This appeal followed.

III.   LEGAL STANDARD

5       When reviewing a bankruptcy court decision, the district court "functions as an appellate

6   court" and "applies the same standards of review as a federal court of appeals."  *In re Crystal*

7   *Properties, Ltd., L.P.*, 268 F.3d 743, 755 (9th Cir. 2001).  While the bankruptcy court's conclusions

8   of law are reviewed de novo, *see In re Thorpe Insulation Co.*, 677 F.3d 869, 879 (9th Cir. 2012), the

9   standard of review for its factual findings depend on whether the underlying proceeding is "core" or

10  "non-core."  When the bankruptcy court is engaged in a "core proceeding," its decision is final and

11  its factual findings are reviewed for clear error.  *In re Harris*, 590 F.3d 730, 736 (9th Cir. 2009).

12  When the bankruptcy court adjudicates a "non-core" matter, it only has the power to make

13  "proposed findings of fact and law" that a district court must review de novo.  *Id.* at 736–37.

14  Because confirmation of a § 524(g) reorganization plan is a "core" proceeding, *see Plant III*, 734

15  F.3d at 908, the bankruptcy court's findings of fact are reviewed for clear error.

IV.   DISCUSSION

17      Focusing on a single provision of the Bankruptcy Code, this appeal argues that the Revised

18  Plan still does not satisfy the statute's requirement that the trust "own, or by the exercise of rights

19  granted under such plan would be entitled to own if specified contingencies occur, a majority of the

20  voting shares" of the reorganized debtor.  *See* 524(g)(2)(B)(i)(III).  Appellants contend the Revised

21  Plan runs afoul of this requirement in two respects.  First, it requires the Trust to make a costly

22  initial investment in Bayside.  In light of that investment, Appellants argue, the actual cost of control

23  is extremely high.  In Appellants' view, the Revised Plan cannot place *any* price on majority

24  ownership, much less one that far exceeds the value of the underlying equity.  Second, Appellants

25  argue the ROFO prevents the Trust from selling its shares in Bayside "for appropriate value," and

26  makes it "most likely" that Bayside or its principals will repurchase the stock on advantageous terms

27  if the Trust, having exercised the warrant, chooses to sell the stock.  (App. at 7:11).

28

**United States District Court**
For the Northern District of California

A. <u>Invoking the Warrant to Take Control</u>

Appellants' first argument focuses on framing: what does it really "cost" the Trust to obtain control of Bayside, and does such cost preclude the Revised Plan from satisfying the control requirement?  Under the Revised Plan, the Trust can exercise its 11% warrant for a mere $1— thereby all but erasing the $1,122,559 required by the Original Plan.  In Appellants' view, though, it is pointless to view the warrant price in isolation.  Instead, they urge, the court must consider the "true" price of majority ownership: $2,000,001, which accounts for the Trust's initial investment ($2,000,000 for 40% equity) and its warrant ($1 for an additional 11%).  If the cost of majority ownership is framed accordingly, there is no dispute that the Trust must pay an over-market price to acquire eventual control of Bayside.[6]  The Plan Proponents, however, see it differently.  In their view, for purposes of assessing whether the control requirement has been satisfied, it is irrelevant what the Trust paid for its first 40% of Bayside.

Before addressing the merits of Appellant's first argument, a brief detour is warranted to explain how the Ninth Circuit in *Plant III* addressed a different provision of § 524(g).  In their challenge to the Original Plan, the Insurers argued that by requiring the Trust to pay $2 million for 40% of Bayside, the Plan failed to satisfy § 524(g)'s requirement that the trust be "funded in whole or in part" by the securities of the reorganized debtor.  *See* § 524(g)(2)(B)(i)(II).  Appellants had argued that by removing $2,000,000 in cash from the Trust in exchange for $500,000 worth of equity, the Trust is actually "de-funded" by Bayside.  The Ninth Circuit disagreed.  While the court acknowledged the Trust paid more than market value for the shares acquired at confirmation, it held that it was not necessary under the statute's funding requirement that the Trust receive any net value from the debtor through that transfer.  *See* 734 F.3d at 914 ("[A]ll that this particular subsection must accomplish is to ensure that the Trust receives a stake, of some value, in the reorganized debtor.").  The court further rejected Appellants' suggestion that the bankruptcy court be required to conduct an inquiry focused on whether the Trust obtained a "fair deal" in the transaction to acquire those securities, finding that such a requirement could be found elsewhere in the statute, like the requirements of good faith (11 U.S.C. § 1129(a)(3)) or the requirement that the court ensure the

---

[6] In its prior order confirming the Original Plan, the bankruptcy court concluded that 40% equity in Bayside was worth approximately $500,000.

**United States District Court**
For the Northern District of California

1   injunction is "fair and equitable" (11 U.S.C. § 524(g)(4)(B)(ii)).  *Id.*  The court further noted that,

2   "as the bankruptcy court recognized, the Trust is getting a valuable asset from the debtor that dwarfs

3   anything Bayside could provide—over one hundred million dollars in insurance settlement

4   proceeds."  *Id.* at 914-915.

5           In the present appeal, the Insurers object to the investment requirement on different statutory

6   grounds, arguing the overall price of $2,000,001 cannot possibly satisfy the Ninth Circuit's

7   interpretation of the control requirement found in § 524(g)(2)(B)(i)(III).  In Appellants' view, the

8   Ninth Circuit made clear that "the Trust should not be required to *purchase* this control; control is a

9   *statutory right*."  (App. at 17:7-8) (emphasis in original).  Such a reading, however, is not consistent

10  with the language of the Bankruptcy Code.  While there is a "general rule" that the asbestos trust

11  control the reorganized debtor, a plan can still pass muster under the statute if it contains

12  "contingencies regulated by the bankruptcy court to ensure that control [of the debtor] is either a

13  realistic possibility or a backstop to trust insufficiency."  734 F.3d at 916; 11 U.S.C. §

14  524(g)(2)(B)(i)(III).  As the bankruptcy court observed, these "specified contingencies" only come

15  into play when the trust does not acquire a majority of the debtor's voting shares upon confirmation.

16  Because the trust is *always* required to own some securities of the debtor upon confirmation, *see* 734

17  F.3d at 914 (the "funding" requirement found in § 524(g)(2)(B)(i)(II) ensures "that the Trust

18  receives a stake, of some value, in the reorganized debtor"), the phrase "specified contingencies"

19  plainly cannot refer to the terms upon which the trust acquired those shares in the first place.[7]

20  Rather, as the contingency model is an "exception" to the general rule of outright control upon

21  confirmation, *see id.* at 916, "specified contingencies" must refer to the terms upon which the trust

22  has the right to acquire additional shares *after* confirmation.  Accordingly, the bankruptcy court was

23  correct to conclude that under the plain meaning of the statute, the specified contingency in the

24  Revised Plan is the payment of $1.

25          Specified contingencies "cannot be 'shams' that allow control facially, but not in practice."

26  *Id.*  Unlike the Original Plan, which required the Trust to exercise a $1,122,559 warrant in order to

27

28  [7] As the Ninth Circuit pointed out in its discussion of the funding requirement, there are other
    statutory mechanisms for ensuring the fairness of a plan requiring that the trust invest in the
    reorganized debtor.  *See* 734 F.3d at 914.  In so doing, the court did not mention §
    524(g)(2)(B)(i)(III).

**United States District Court**
For the Northern District of California

1   secure control of Bayside, there is no question that the Revised Plan allows control both facially and

2   "in practice." *See id.* Although "[a] mere right of the plan to purchase shares ordinarily will not

3   suffice," the proposed plan no longer creates a situation where the warrant "leaves the trust in

4   scarcely a better position than a third party." *See id.* Indeed, the opposite is true. Whereas the

5   Original Plan required the Trust to pay an over-market price to exercise the warrant, the Revised

6   Plan places the Trust in a much better position than a third party seeking to acquire some portion of

7   the debtor. Indeed, it is difficult to imagine a scenario where, by exercise of some right granted

8   under the plan, it would be easier for the Trust to acquire post-confirmation control of Bayside.[8]

9       The $1 warrant satisfies the statute. By providing a specified contingency under which the

10  Trust can take post-confirmation control of Bayside for a nominal sum, the Revised Plan ensures

11  that control is far from illusory. Indeed, it is even more than a just a "realistic possibility." *See* 734

12  F.3d at 916. Following confirmation, the Trust faces virtually no impediment to its taking control of

13  Bayside at its discretion.

14      B.  The ROFO

15      Appellants further argue that the ROFO, a new feature of the Revised Plan, violates the

16  control requirement by restricting the Trust's ability to sell, and thereby "claim value" in, its

17  Bayside shares. *See* 734 F.3d at 916 n. 9 ("A buyout right could be satisfactory, if that right placed

18  the trust at an advantage such that it could use that right to claim value."). "[T]he Trust cannot

19  'claim value' or 'backstop' the insufficiency of its assets," Appellants contend, "with stock that it

20  cannot sell." (App. at 18:23-24).

21      The Insurers overstate the severity of the transfer restraints imposed by the ROFO. If the

22  Trust wishes to sell any of its Bayside shares, it must first offer the shares to Bayside, Ameli, and

23  Badakhshan. If any ROFO holder elects to buy but the parties cannot agree on a price, the shares

---

[8] As the bankruptcy court observed, this contingency is arguably less burdensome than one of the hypothetical contingencies posed by the Ninth Circuit in *Plant III*. Recall the court's remark that it is "easy to imagine" what contingencies might satisfy the control requirement: "Most straightforwardly, a contingency that promised to transfer control to the trust in the event that it proved insufficient would clearly comply with this provision." 734 F.3d at 916, n. 9. This dicta indicates a control-upon-trust-insufficiency contingency would satisfy the statute regardless of the terms under which the trust would acquire securities of the debtor upon confirmation. Assuming that sort of contingency would require *some* showing by the trust that it is unable to pay asbestos claims as contemplated by the plan, such a requirement would likely be more burdensome than the one proposed in the Revised Plan, under which the Trust need only pay a single dollar to gain majority control of the debtor's voting shares.

**United States District Court**
For the Northern District of California

1    are priced using a valuation method that is, according to a finding by the bankruptcy court,

2    reasonable.  *See Plant IV* Memo at 22.  If the ROFO holders never agree to purchase in the first

3    place, the Trust can then sell its shares to third parties.  So while the ROFO precludes the Trust from

4    taking its Bayside shares directly to the market, it cannot be said that the Trust "cannot sell" its

5    Bayside shares.

6           While the Ninth Circuit emphasized that a buyout right must place the trust in a position to

7    "claim value," nothing in *Plant III* indicates a § 524(g) trust must retain an unbridled right to sell its

8    shares of the reorganized debtor however it sees fit.  Nor does the text of the statute contain such a

9    requirement.  The Ninth Circuit made clear that § 524(g)(2)(B)(i)(III) is about "control over the

10   reorganized debtor's future operations."  734 F.3d at 915.  As the bankruptcy court observed,

11   control over such operations is derived "from holding a majority of voting shares, not from selling

12   those shares."  *Plant IV*, Memo at 18; *see also* 734 F.3d at 915 (statute's purpose signaled by use of

13   "key" phrase "voting shares").  Accordingly, the bankruptcy court was correct to conclude that §

14   524(g)(2)(B)(i)(III) does not bar a reorganization plan from imposing reasonable restraints on a

15   trust's ability to transfer shares.[9]

16          Nor did the bankruptcy court err in assessing the reasonableness of the restrictions imposed

17   by the ROFO.  During the two-day evidentiary hearing on the Revised Plan, the court heard expert

18   testimony from the Proponents and the Insurers regarding, among other things, the likely effect of

19   the ROFO on the Trust's ability to sell its Bayside shares for fair value.  Afterwards, the bankruptcy

20   court issued a thorough Memorandum Opinion holding that the ROFO's restrictions are indeed

21   reasonable.

22          The court's conclusion was grounded in several findings.  For one, the court found that by

23   using baseball arbitration, which by its nature encourages reasonable offers from both parties, the

24   ROFO provides a reasonable means of valuing Bayside's shares.  Although the Insurers' experts

25   offered testimony to the contrary, the court found that testimony to be "wholly unpersuasive."  *Plant*

26   *IV*, Memo at 22.  One of the Insurers' experts testified that the ROFO's arbitration valuation

27   procedure was unreliable for numerous reasons, including that market transactions are "always more

28   _____

[9] For their part, Appellees contend that *any* restraint on transferability, including an outright bar on a trust's ability to sell shares, is permissible under the statute.  Because the Revised Plan does not include such a restriction, this order need not decide whether it would be permissible to do so.

United States District Court

For the Northern District of California

1    accurate than arbitration" and that "baseball arbitration is not the type commonly used in valuing

2    companies." *Id.* at 17 (paraphrasing expert Neil Beaton).  The court reasoned that the ROFO's

3    valuation should not be measured *only* against a market transaction, however, "because the very

4    nature of the restraints on transfer permitted in closely held corporations is to bar open-market

5    transactions that could frustrate legitimate interests of other shareholders."  *Id.* at 22.

6        Indeed, as the court observed, and as one of the Insurers' experts acknowledged, it is

7    common for closely-held corporations to restrict the persons to whom shares can be transferred.  *Id.*

8    at 19; F. Hodge O'Neal, Restrictions on Transfer of Stock in Closely Held Corporations: Planning

9    and Drafting, 65 Harv. L. Rev. 773 (1952) ("[S]hareholders in a closely held enterprise usually

10   desire to retain the power to choose future associates.").  From the shareholders' perspective, there

11   is good reason for such restrictions—"[e]ach shareholder wants to be in a position to prevent

12   outsiders from entering the business if he doubts their integrity or business judgment."  *Id.*  Looking

13   to California law, the court observed that both the Corporations Code and California case law

14   recognize a closely-held corporation's interest in restricting share transfers.  *See* Cal Cop. Code §

15   204(b); 9 Witkin, Summary 10th (2005) Corp, § 129, p. 903 ("The usual restriction is designed to

16   safeguard the membership of close corporations from entry of unacceptable outsiders, by requiring a

17   first offering of the shares to existing stockholders or the corporation.  It is not an unreasonable

18   curtailment of the right of alienation or an unreasonable deprivation of the shareholder's substantial

19   rights.").

20       Another of the Insurers' experts testified that the ROFO may prevent the Trust from seeking

21   third-party offers before offering to sell its shares to the ROFO holders.  The bankruptcy court

22   disagreed, finding that the ROFO does *not* preclude such bids.  Indeed, the court held that the Trust

23   could solicit third-party bids and submit those bids as evidence of Bayside's value during baseball

24   arbitration.  Accordingly, even though baseball arbitration is a closed process between the Trust and

25   the ROFO holder, the ROFO's valuation procedures are not necessarily insulated from market

26   influences.  The court accordingly found no reason why baseball arbitration would be harmful to the

27   Trust.

28

**United States District Court**
For the Northern District of California

1    The court further found that the ROFO does not merely burden the trust; it provides potential

2 benefits, too.  By ensuring that Bayside's managers will not be required to associate and share

3 profits with third-party buyers, the ROFO "may" enhance the value of the Trust's shares:

4    While the ROFO might decrease the Trust's ability to sell the shares for their full
     value by restricting the persons to whom those shares may be sold, it may have the

5    countervailing effect of increasing the value of those shares by eliciting greater
     efforts from Ameli and Badakhshan.

6

7 *Plant IV*, Memo at 20-21.  In any event, the court concluded, it is far from clear that the Trust would

8 be able to find a purchaser for its Bayside shares in the open market.  *Id*. at 21.  Although one of the

9 Insurers' experts testified that there is an active market for partial interests in small companies

10 generally, he did not testify that there is an effective market for partial interests in *all* companies

11 including the likes of Bayside.  As the bankruptcy court observed, Bayside's managers may well be

12 the only persons interested in buying the Trust's shares.  Accordingly, the court concluded, "it is far

13 from certain that the ROFO materially diminishes the benefits of ownership of the shares." *Id.*

14    The Insurers contend the bankruptcy court erred by looking towards California law when

15 assessing whether the ROFO's restraints are permissible.  Their appeal, however, overstates the

16 court's reliance on state law.  The bankruptcy court's approval of the ROFO did not, as the Insurers

17 contend, "fail[] to consider what federal law requires."  (App. at 20:4).  The court concluded first

18 and foremost that § 524(g)(2)(B)(i)(III) permits reasonable restraints on a trust's ability to transfer

19 shares of the reorganized debtor.  Only then did the court look to the law of corporations generally,

20 and to California law in particular, to explain that it is common for closely-held corporations to

21 restrain the transferability of company shares, a specific area on which federal law is silent.  To be

22 sure, there are important differences between (i) what is allowed under California corporations law

23 and (ii) what is required under the Bankruptcy Code, but the court did not conflate these concepts.[10]

24 Rather, it concluded that *despite* the ROFO's restrictions on transfer—restrictions that are

25 commonplace among closely-held corporations generally—the Revised Plan satisfies the control

26 _____

[10] While the law of closely-held corporations protects the interests of a corporation's manager-
27 shareholders, § 524(g)(2)(B)(i)(III) serves to ensure that, among other things, when a trust does not
retain majority control upon confirmation, it at least remains in a position to take control and "claim
28 value."  734 F.3d at 916 n. 9.  To the extent a trust chooses to claim value by selling the debtor's
shares, there is some tension between the trust's interest in transferring the shares and the manager-
shareholders' interest in retaining some backstop against the prospect of associating with unknown
third-party buyers.

**United States District Court**
For the Northern District of California

1    requirement because the ROFO creates benefits for the Trust while ensuring the Trust can sell its

2    Bayside shares through a "reasonable" valuation process.

3           Appellants also lodge a few factual objections, arguing the bankruptcy court committed clear

4    error in its assessment of the ROFO's potential benefits.  For one, Appellants dispute the court's

5    conclusion that the ROFO "may" enhance the value of the Trust's shares by encouraging Bayside's

6    managers to "continue to devote their skills and efforts to the company."  *See Plant IV*, Memo at 20.

7    As it stands, Ameli and Badakhshan already hold five-year employment contracts with Bayside

8    offering significant yearly compensation plus bonuses tied to the company's net operating profit.

9    Following the five-year term, they have the option of renewing for up to five additional one-year

10   terms.  Appellants argue that because of these "lucrative" employment agreements, the managers

11   "[n]eed[]" no further encouragement to devote themselves to Bayside.  (App. at 20:7, 15).

12          For a bankruptcy court's factual finding to be "clearly erroneous," it must be "illogical,

13   implausible, or without support in the record."  *In re Retz*, 606 F.3d 1189, 1196 (9th Cir. 2010).

14   Although the Insurers offer support for their contention that Ameli and Badakhshan do not "need"

15   more encouragement, their appeal falls far short of explaining why it was illogical, implausible, or

16   without support for the bankruptcy court to find simply that the ROFO "may" enhance Bayside's

17   value by incentivizing the managers' continued devotion.  After all, the court's finding was couched

18   in general terms; it did not conclude the ROFO *would* necessarily increase Bayside's value.

19   Moreover, it is immaterial whether Bayside's managers "need" more encouragement.  The

20   bankruptcy court concluded only that the ROFO provides additional encouragement, thereby

21   *possibly* making the company more valuable.

22          Appellants' second factual objection fares no better.  The Insurers argue the bankruptcy

23   court committed clear error by finding it "far from certain" that the Trust would locate a purchaser

24   for its Bayside shares in the open market.  *Plant IV*, Memo at 21.  The court reasoned that shares of

25   the company "*might* not be of much value to a third party" and that the Bayside managers "*may* be

26   the only parties interested in buying the Trust's shares."  *Id.* (emphasis added).  Mr. Beaton, one of

27   the Insurers' experts, posited that while the Bayside ROFO is "essentially meaningless from an

28   economic standpoint" because Bayside's overall equity value is, at present, marginal, the company

     *could* become "considerably more valuable" in five or ten years if its operations were to improve

**United States District Court**
For the Northern District of California

"materially." (App. at 22 n. 18). Appellants take the position that while Bayside today may not be attractive to third-party buyers, it could be highly valuable in the future, at which point the ROFO's restrictions would pose a more palpable barrier to the Trust's ability to claim value. Again, however, the Insurers fall far short of explaining why the bankruptcy court's finding was unsupported, illogical, or implausible. The court concluded there was a lack of testimony showing the existence of an effective market for partial interests in all companies like Bayside. Again, the court's challenged factual finding was not couched in absolute language; the court found only that it is "far from certain" that the Trust would find a purchaser for its Bayside shares on the open market. *Plant IV*, Memo at 21. For purposes of establishing that the court committed "clear error," it is not enough that Appellants point to evidence in the record supporting a contrary outcome.

## V.    CONCLUSION

While § 524(g)(2)(B)(i)(III) "is about control over the reorganized debtor's future operations," *see* 734 F.3d at 915, the statute does not require that the trust retain an unfettered right to sell its shares in the organized debtor. Nor does the statute preclude an arrangement whereby the trust is required to invest in the reorganized debtor at confirmation, even at an over-market price. Because Appellants' claims of legal and factual error are without merit, the appeal is denied.

IT IS SO ORDERED.

Dated: 8/18/14

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

16